LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
A Professional Corporation
ANDREW W. ZEPEDA, State Bar No. 106509
azepeda@lurie-zepeda.com
STEVEN L. HOGAN, State Bar No. 84553
shogan@lurie-zepeda.com
PAYTON E. GAROFALO, State Bar No. 274135
pgarofalo@lurie-zepeda.com
ALEXIS I. FRAGOSA, State Bar No. 313711
afragosa@lurie-zepeda.com
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574
PH: (310) 274-8700   FAX: (310) 274-2798

BOOTH LLP
A Professional Corporation
BENJAMIN L. CAPLAN, State Bar No. 265179
bcaplan@boothllp.com
IAN P. CULVER, State Bar No. 245106
iculver@boothllp.com
1849 Sawtelle Boulevard, Suite 500
Los Angeles, California 90025
PH: (310) 641-1800   FAX: (310) 641-1818

Attorneys for Defendant and Counter-Claimant
PTB Sales, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BROOKS AUTOMATION, INC,, a Delaware corporation,<br><br>   Plaintiff,<br><br>v.<br><br>PTB SALES, INC., a California corporation,<br><br>   Defendant. | Case No. 2:17-cv- 03880-PA (AFMx)<br>(Assigned to Hon. Percy Anderson)<br><br>**DEFENDANT AND COUNTER-CLAIMANT PTB SALES, INC.'S OPPOSITION TO PLAINTIFF AND COUNTER-DEFENDANT BROOKS AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: March 5, 2018<br>Time: 1:30 p.m.<br>Ctrm.: 9A |

Defendant and Cross-Complainant PTB Sales, Inc. ("PTB") hereby submits its Opposition to Plaintiff and Counter-Defendant Brooks Automation, Inc.'s ("Brooks") Motion for Summary Judgment (the "Motion") as follows:

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

# I. INTRODUCTION

This Motion is nothing more than a regurgitation of the same arguments set forth by Brooks in its Motion to Dismiss, which was already denied by the Court.  In fact, although styled as a summary judgment motion, it really is a pleading motion because nearly all of the evidence submitted by Brooks in its support is inadmissible.  None of the declarations met the essential criteria required for a declaration, 28 USC § 1746(2).  The "declarations" conclude "signed under penalties of perjury" with no averment that the facts recited are "true and correct" essential to a valid declaration.  The declarations are riddled with inadmissible hearsay and improper "expert" testimony.  The declarants lack personal knowledge regarding the facts and fail to authenticate their exhibits.

Despite the fact that Brooks has failed to carry its burden of proof, PTB sets forth genuine issues of material fact in support of each of its Counter-Claims.  As argued in opposition to Brooks' Motion to Dismiss, the facts of this case mirror the facts in Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451 (1992), and are thus more than sufficient to create a genuine issue of material fact regarding whether Brooks' conduct constitutes unlawful monopolization.  A genuine issue of material fact clearly exists regarding PTB's tying claim given that Brooks managed to secure 100% of Samsung's Cryopump repair business despite PTB's perfect quality score and lower pricing less than two weeks after Brooks tied its Robot repair proposal to its Cryopump repair services.  Finally, a genuine issue of material fact also exists regarding whether Brooks' conduct, which an employee from Samsung described as slanderous, constitutes trade libel.  For the reasons set forth below, the Court should deny Brooks' Motion in its entirety.

# II. FACTUAL BACKGROUND

## A. Brooks' Business.

Brooks is a worldwide manufacturer of cryogenic pumps ("Cryopumps"), among other things, with a market share in excess of 85% domestically and a predominate share internationally.  Statement of Genuine Issues of Material Fact ("SGIMF"), ¶ 57.  Brooks'

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

Cryopumps are unique and are not compatible with Cryopumps manufactured by others, and vice versa.  Id. ¶ 58.

Brooks manufactures three generations of Cryopumps: (1) CryoTorrs; (2) OnBoard Cryopumps; and (3) OnBoard IS Cryopumps.  Id. ¶ 5.  The second and third generation of Brooks' Cryopumps contain embedded software ("Firmware") in "control modules" which control and monitor the Cryopumps.  Id. ¶ 6.  Cryopumps manufactured by others cannot interface with any generation of Brooks' Firmware.  Id. ¶ 59.

Brooks sells its Cryopumps individually but often sells its Cryopumps to other manufacturers like Applied Materials who incorporate the Cryopump into a larger assemblage or "Tool".  Id. ¶ 60.  Brooks also manufactures other devices that are incorporated into Tools, including wafer-handling robots ("Robots").  Id. ¶ 3.  Brooks holds at least a 50% market share of the manufacture of Robots and controls 95-99% of the market share for repairs thereof.  Id. ¶ 61.

Brooks provides service and parts for all three generations of its Cryopumps to its customers.  Id. ¶¶ 11-12.  It manufactures some of the parts itself; the rest are made to order for Brooks by independent original–equipment manufacturers ("OEMs").  Id. ¶ 62.  Brooks' OEMs have agreed not to sell parts manufactured by the OEMs for Brooks' Cryopumps to anyone other than Brooks.  Brooks, therefore, has a monopoly on parts for its Cryopumps.  Id. ¶ 63.  There is no meaningful secondary market in the U.S. for the sale and purchase of Brooks' Cryopump parts.  Id. ¶ 64.  Brooks controls at least 70% of the market share for the servicing and repair of its own Cryopumps.  Id. ¶ 23.  More specifically, Brooks currently provides 56% of the service for On Board Cryopumps and 89% of the service for OnBoard IS Cryopumps.  Id.

The service of Cryopumps is a market separate from the manufacture and sale of replacement parts for Cryopumps.  Id. ¶ 65.  Brooks' policies create entry barriers to potential competitors by requiring them to enter two markets simultaneously, to wit, the manufacture of parts capable of incorporation into Brooks' Cryopumps and the servicing of Brooks' Cryopumps.  Id. ¶ 66.  Brooks intended, through these policies, to make it

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

more difficult for Independent Service Organizations ("ISOs"), including PTB, to sell service for Brooks' Cryopumps.  Id. ¶ 67.  Brooks has succeeded in large part.  ISOs like PTB were, and are, unable to obtain parts from reliable sources.  Customers were forced to switch to Brooks for service of Cryopumps even though they preferred ISO service. Id. ¶ 68.

**B.  PTB's Business.**

PTB is an ISO which, among other things, services, repairs and rebuilds Cryopumps.  Id. ¶ 13.  To accomplish the refurbishing and repair of Brooks' Cryopumps, PTB began purchasing parts from Brooks in or about 2000 and by 2010 had become a regular customer of Brooks having made over 230 purchases in the previous decade.  Id. ¶ 30.  From 2000 until 2011, Brooks sold parts to PTB for any generation of Brooks' Cryopumps.  Id.

From and after 2000, PTB began to gain market share in the servicing of Brooks' Cryopumps.  By 2010, PTB was the only significant ISO qualified to service and refurbish Brooks' Cryopumps and had acquired approximately 5% of the market share. Id. ¶ 69.  PTB priced its Cryopump rebuilding competitively and routinely priced its services at about 25% below Brooks' rates.  Id. ¶ 70.  PTB also perfected systems that allowed it to efficiently process refurbishing orders and to achieve turn-around times much shorter than Brooks.  Id. ¶ 71.  PTB achieved commendable quality assurance levels and enjoyed a warranty return rate similar to or lower than Brooks.  Id. ¶ 72.

**C.  Brooks' Anti-Competitive Conduct With PTB.**

In or about June 2010, Brooks notified PTB that it was unilaterally terminating its course of dealing with PTB because PTB was not an OEM or end-user.  PTB immediately challenged this termination notice and Brooks thereafter withdrew the purported termination.  Id. ¶ 73.  Thereafter, PTB continued to purchase parts from Brooks until November 2011 when Brooks notified PTB that it would not sell any parts to PTB, claiming to have a long-standing policy against selling spares on a retail basis. Id. 31.  PTB challenged this termination given that PTB had been purchasing parts on a

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

"retail" basis from Brooks for over a decade at that time.  Id.  Brooks promised in writing to continue to supply those parts previously supplied to PTB on current pricing terms, but announced that it would not sell control modules *or any other parts* for the OnBoard IS Cryopumps to PTB at any price.  Id.

In mid-February 2014, PTB submitted an order to Brooks for the purchase of 15 three-phase motors for incorporation into OnBoard Cryopumps.  On receipt of the purchase order, Brooks informed PTB that it was "zero bin" on the motors and could not fill the order until May 29, 2014, a delay of over three and half months.  Id. ¶ 74.  PTB immediately complained about the lengthy delay in the processing of the order.  PTB asked if it could deal directly with the OEM of the component motors, but Brooks refused to divulge any information about its motor supplier.  Id. ¶ 75.  PTB then requested a quote from Brooks to perform the repair services which PTB had been engaged to perform for its customer, entailing the installation of the same three-phase motor.  Brooks responded with a written quote and represented that it could complete the repair and installation of the new three phase motor in a mere four weeks.  Id. ¶ 76.

PTB complained to Brooks that its unreasonable delay in processing sales appeared to be forcing third party refurbishers to purchase repair services as a pre-requisite to obtain the reasonably timely purchase of parts.  Nonetheless, Brooks continued to delay the filling of orders made by PTB and to quote unreasonably long lead times for filling orders.  Brooks further refused on at least one other occasion to process orders for PTB. Id. ¶ 77.

PTB began purchasing all three generations of used Brooks' Cryopumps from end-users who were scrapping them or who had decided not to repair them.  Id. ¶ 78.  PTB developed a highly sophisticated set of processes whereby it disassembled the scrapped Cryopumps, meticulously cleaned the component parts, separated the component parts, tested and repaired the component parts, and then re-assembled the component parts, which might come from any number of scrapped Cryopumps, into rebuilt Cryopumps. Id. ¶ 79.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

In or about December 2015, Brooks began accusing PTB of violating its alleged copyrights and trademarks.  Id. ¶ 35.  PTB denied the allegations.  Brooks then accused PTB of updating control modules in older OnBoard IS Cryopumps with the latest iteration of Brooks' Firmware.  Id. ¶ 80.  When PTB explained that it swapped control modules containing the latest iteration of the Firmware into older OnBoard IS Cryopumps, Brooks claimed for the first time that the Firmware was subject to a license that prohibited the transfer of the Firmware to anyone without Brooks' written consent. Id. ¶ 81.

**D.**   **Brooks' Tying Arrangement With Samsung And Trade Libel Against PTB.**

An August 2012 PowerPoint presentation entitled "Fab Service Market Share Gain Plan" outlined Brooks' aggressive strategy to eliminate or reduce third party service providers from the Cryopump repair business, advising its sales team to "Use all weapons to win against 3rd parties" including "Bundle Cryo & Robot repairs in pricing agreements" and specifically identified PTB as a target.  Id. ¶ 83.  "Bundling" is just another word for "tying" when one considers Brooks' monopolistic position in the market for Robot repair.

    1.   Brooks Admits It Lost the Cryopump Repair for Samsung's Implant Division for Poor Quality, Slow Turnaround Time, Poor Customer Service and High Costs

Brooks had secured the Cryopump repair business at the Implant division of Samsung but lost that business in or about 2015 because, as Brooks admitted, Samsung was dissatisfied with Brooks' lead time, quality, and price.  Id. ¶ 84.  A third party service provider, Texas Capitol Semiconductor ("TCS"), replaced Brooks.  TCS apparently failed to satisfy Samsung thereafter.  Id. ¶ 85.  In or about July 2016, Samsung's Implant division "qualified" PTB to provide Cryopump repair services after trials of PTB's refurbished Cryopumps.  Id. ¶ 44.  Brooks had provided Cryopump repair services for the PVD division of Samsung for years but PTB was providing Cryopump services for the PVD division as well beginning in Fall 2016.  Id. ¶¶ 86- 87.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

A January 2017 PowerPoint presentation entitled "Single Page Strategy – Samsung Semiconductor, Austin, Texas" stated that Brooks "[l]ost Implant to TCS due to quality, responsiveness and price." Id. ¶ 88.

>    2.    Samsung's CVD Division Desperately Needed Prompter and More Dedicated Field Service for Repair of its Critical Vacuum Robots and Solicited a Proposal from Brooks Which Held a Monopolistic Share in the Market for Repair of Its Own Vacuum Robots

In early January 2017, Morrison Cleghorn, a senior engineering technician and parts conductor for Samsung's PVD division requested a proposal from Brooks for the field service and repair of its Robots in the CVD division of Samsung. Id. ¶ 45. Mr. Cleghorn explained the CVD division's dilemma. Id. CVD had a contract with LAM, the tool provider for the maintenance of the tool and components including the Brooks' Robots. Id. Brooks was under a subcontract with LAM to provide Robot repair services but was only obligated to provide personnel to address Robot breakdowns within a 14 day response time. Id. This was far too long for CVD, which needed Robot field service repair 24 hours, 7 days a week on a minimum 4 hour notice so that its tools would not be shut down for weeks waiting for Brooks. Id.

Brooks held a monopolistic position in the repair of Brooks' Robots. Id. ¶ 89. Brooks refused to sell replacement parts for its Robots to third party service providers leaving them unable to effectively compete for the Robot service and repair business. Id. ¶ 90. Hence, Brooks had substantial leverage over Samsung.

Aware of CVD's need for Robot field support on a much more intense basis, Mr. Eisinger proposed to Mr. Cleghorn that Brooks be permitted to propose servicing Samsung's PVD Cryopumps. Id. ¶ 46. Mr. Cleghorn did not invite this proposal. Id. ¶ 50.

Samsung's Customer Repair Center ("CRC") had approached Mr. Cleghorn in the first quarter of 2017 right after PTB had started servicing Implant's Cryopumps to see if PVD also wanted to switch to PTB based on the great reviews for service, turnaround

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

time and cost provided by Implant.  Id. ¶ 44.  PTB qualified to service PVD's Cryopumps in the third quarter of 2016.  Id. ¶ 91.  Samsung's repair center had given the green light for PTB to repair PVD's Cryopumps, which most likely caused Brooks to notice a drop in their Cryopump business.  Id. ¶ 92.  PTB had repaired approximately 32-33 of PVD's Cryopumps at this time, none of which were tagged for warranty issues.  Id. ¶ 93.

Thereafter, Brooks plotted internally how it could secure 100% of PVD's Cryopump work.  Mr. Eisinger expressed concern: "PVD is using us but not 100% as they are evaluating a switch to PTB…One of the concerns that I expressed in the recent past was that a third party in Implant [PTB] would bleed over to PVD and this is now happening."  Id. ¶ 94.

In a February 6, 2017 email, Brooks' Global Product Manager, Steve Ham, outlined "next steps" for Brooks' proposal to Samsung, including "Present PTB stories" and in a February 7, 2017 email, to Charlie Ray, Brooks' senior manager of manufacturing engineering, asked "When do you think we will have a full [failure analysis] done on returned PTB pump?  Len would need a presentation by end of this week for his upcoming [Samsung] visit next week."  Id. ¶ 95.

In a February 8, 2017 email, Mr. Eisinger stated "[Samsung] is now using PTB for implant and PVD is considering them.  We are working on proposals for both groups to win back and maintain business."  Id. ¶ 96.  On the same day, Mr. Ham replied "Just so that you know, Charlie has found some issues with PTB's repaired OB8F pump.  Id. ¶ 97.

Meanwhile, Mr. Cleghorn at PVD was getting impatient: "We have been waiting weeks for the robot service proposal.  I need an offer regarding the robots which may include cryopump refurbishments.  More than enough time has been provided to your team to create a reasonable proposal.  If we aren't ready to discuss the robots I have no interest in discussing the cryopumps."  Id. ¶ 46.

Mr. Eisinger and other individuals from Brooks met with key group leaders and engineers at Samsung to discuss robot service on three occasions and had ongoing

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

{00409394.DOCX}

meetings with the Implant and PVD groups.  Id. ¶ 46.  On March 30, 2017, Brooks finally made a proposal to Samsung for the repair of Samsung's Robots in a lengthy PowerPoint presentation.  Id.  That proposal included two options *both of which conditioned the provision of the further field service of 20 or 40 hours per week for Robot repair on Brooks being given exclusive rights to 100% of all Cryopump repair*.[1] Id.  The first option was for 100% of all PVD Cryopump repair; the second option was for 100% of repair of all Cryopumps in both Implant and PVD.  Id.  No proposal for Robot repair was ever made without being bundled with Cryopump repair.  Id. ¶ 50.

Samsung's general practice was not to give exclusivity to any repair provider.  Id. However, Brooks never made a proposal for Robot repair work that did not include exclusive 100% Cryopump repair work for the PVD division.  Id.  In the final agreement inked in June 2017, Brooks exclusively was to provide 100% of the repair business for Samsung's PVD Cryopumps, 100% of the repair business for Samsung's Robots, and 50% of the repair business for Samsung's Implant Cryopumps.  Id. ¶¶ 47-49.  As noted below, this contractual reservation of 50% of the Implant Cryopump repair never eventuated because Samsung inexplicably terminated PTB from the Cryopump repair work there, leaving Brooks with 100% of the Implant division's Cryopump repair.

Mr. Cleghorn informed John Varone, Vice President of Engineering for PTB, after the fact that Samsung's management had been desperate for the Robot service that only Brooks could provide and therefore gave Brooks the Cryopump service for PVD.  Id. ¶ 53.

3.   PTB's Stellar Performance For Samsung.

In June or July 2016, PTB "qualified" with Samsung to repair the OnBoard IS Cryopumps in the Implant division.  Id. ¶ 44.  In Fall 2016, PTB started doing repairs on Brooks' Cryopumps for Samsung's PVD division as well.  Id.  From July 2016 through

---

[11] The same March 30, 2017 PowerPoint presentation included a section entitled "3rd Party Repair Practices", which purported to show photographs and otherwise describe poor quality repair work by PTB.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

April 11, 2017, PTB did not receive any significant complaints from either division of Samsung regarding the quality of PTB's repairs.  Id.  If Samsung had any issues with the services provided by PTB, it was the overall turnaround time, i.e., the amount of time it took PTB to return a refurbished Cryopump to Samsung.  Id.

In a March 15, 2017 teleconference, Samsung and PTB discussed recent repair activities in order to improve performance and enable increased opportunities, focusing almost exclusively on turnaround time.  Id.  Quality was not mentioned.  Id.  At the end of the teleconference, Samsung provided a scorecard for PTB for the first quarter of 2017 (January 1, 2017 through March 31, 2017).  Id.  The scorecard identified 44 Cryopumps that PTB had refurbished for Implant and PVD.  PTB received a perfect score of 4 for quality and an overall rating of 3.3 out of 4.  Id.  The metrics of the scorecards were "completely data driven."  To earn a 4 for quality, the service provider had to have zero failures.  Id.

On April 7, 2017, PTB received an email with the full first quarter scorecard (January 1, 2017 through March 31, 2017) again earning 4 on quality for zero failures or quality issues and a cumulative 3.3 score for quality, customer service, turnaround time and cost.  Id.  A 3.3 score represented "Exceeds Expectations".  Id.  The scorecards were prepared by Samsung's Customer Repair Center and were based on the tracking system for each repaired item.  Id.  The scores were based entirely on data and were not a matter of employee polling.  Id.

Then, without any advance notice whatsoever, on April 11, 2017, <u>12 days after Samsung was presented with Brooks' tying proposal and its PowerPoint slides disparaging PTB's work</u>, PTB received an email from Alexis Fernandez at Samsung stating "Our leadership has decided to move away from using PTB as a preferred Cryo vendor due to quality issues."  Id.  This was a complete puzzlement to PTB which, of course was wholly ignorant of Brooks tying and disparaging slide show.  Id.  Samsung had not returned any Cryopumps for warranty issues and had had no complaints.  Id.  Mr. Varone told Mr. Fernandez that he was only aware of one failure (as to which PTB did

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

not believe it was at fault) and provided him with a list of the Cryopumps repaired by PTB and asked him to identify the problem Cryopumps.  Id.  PTB never received a response to this request.  Id.  Instead, Hampton James, the manager of Implant at Samsung, emailed Mr. Varone stating "I'm saddened to hear that your company PTB with a rating of 3.3 was not aware of the current life time issues of PTB rebuilds and the recent DOA's…We can not [sic] meet our customer needs with this kind of performance from an auxiliary pump.  Something has changed in your quality…"  Id.

PTB concluded that this complaint by the Implant division about quality of service was a cover for some other reason for Samsung's abrupt and otherwise inexplicable decision to terminate PTB's excellent services.  Id.  All of the repair work performed by PTB for Samsung had been paid for.  Id.  The repair price included a warranty, which would have covered any of the alleged failures.  Id.  Yet Samsung's Implant never returned any of the alleged failures or "dead on arrivals" to PTB for warranty work and abruptly stopped using PTB for service thereafter.  Id.  To fault PTB for not being aware of these "quality" issues was patently absurd since the customer would first need to complain of quality issues before the service organization could be expected to know there were quality issues.  Id.  All the Cryopump repair work PTB had performed for Implant was turned over to Brooks who charged 20% more than PTB and had proved incapable only a few years previously at Implant.  Id. ¶¶ 53, [CITE].  PVD engaged PTB for a few additional repairs and then similarly stopped using PTB for service.  Id. ¶ 53.  In total, PTB repaired 77 Cryopumps for Implant and PVD.  PTB never received a single warranty claim related to any of these repairs.  Id. ¶ 44.

PTB had enjoyed annualized revenues of $500,000 performing for Samsung between summer 2016 and early April 2017.  Id. ¶ 98.  PTB stood to make far more based on its remarkable service record, pricing well below Brooks, etc.  The present value of lost Samsung profits to PTB total $660,565.  Id. ¶ 99.  The end-user, Samsung, also suffered injury because it was forced to engage Brooks which it had previously terminated for poor quality, slow turnaround time and poor customer service.  Instead,

1  Samsung was made to pay substantially higher cost (at least 20% more) for the

2  Cryopump work PTB had been performing superlatively.  Id. ¶ 100.

3      4.    Brooks' Libelous PowerPoint Presentation.

4      The PowerPoint presentation made by Brooks to Samsung entitled "Brooks

5  Automation Robot and Cryopump Support and Service" allegedly summarizes a "failure

6  analysis" performed by Brooks on a Cryopump repaired by PTB.  Id. ¶ 56.  The "failure

7  analysis" includes a damaged array which is attributed to PTB.  Id.  However, this type of

8  damage can occur through mishandling of the Cryopump either through shipping or

9  internal handling.  Id.  PTB would never send an array in this condition to any customer.

10  Id.  The "failure analysis" further includes a frozen bearing when the Cryopump allegedly

11  has zero hours.  Id.  All bearings fail and have signs of wear.  Id.  Bearings have a limited

12  life cycle, which is exactly why they are replaced during a rebuild.  Id.  The visible drag

13  depicted on this slide appears to be normal wear.  Id.  There would be more signs of

14  normal wear if this Cryopump was allowed to run for an extended period of time.  Id.

15      The "failure analysis" further includes damage allegedly caused by the installation

16  of suspect hardware.  Id.  It appears the damage was caused by the Cryopump being

17  disassembled by someone without the proper training or tools.  Id.  The lock ring

18  depicted is a standard part.  Id.  PTB has disassembled thousands of Cryopumps without

19  damaging the housing or the lock ring in order to remove the bushing.  Id.  The "failure

20  analysis" further includes the installation of allegedly suspect bolts.  Id.  Brooks presents

21  absolutely no data to indicate the bolts are the wrong size.  Id.  The torque value for bolts

22  is specified by their diameter and thread.  Id.  PTB adheres strictly to those specifications.

23  Id.  PTB does not have a history of latent failures.  Id.  Its 12 month rolling warranty

24  return rate is below 2%.  Id.

25      In addition to the "failure analysis," the PowerPoint presentation includes a slide

26  regarding alleged PTB electronics issues.  Id.  There is no information on this slide tying

27  the electronics to a Cryopump repaired by PTB besides Brooks' bare assertion.  Id.  The

28  next slide is entitled "Workmanship Related to Electronics Performance" but the issues

depicted are not workmanship related.  Id.  There is significant evidence that this damage was caused by dropping the Cryopump.  Id.

Within days after the Power Point presentation which included the "failure analysis" photographs, Samsun's Implant division terminated PTB notwithstanding PTB's stellar quality record at Samsun.

## III.   ARGUMENT

### A.   Brooks Fails To Carry Its Burden On Its Motion For Summary Judgment.

The moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co., Ltd. V. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).  In order to carry its burden of production, the moving party must either produce admissible evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  Id.; see FRCP 56(c)(1)(A)-(B).  In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact.  Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102.

If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial.  Id. at 1103.  In other words, "a moving party may not require the nonmoving party to produce evidence supporting its claim or defense simply by stating that the nonmoving party has no such evidence."  Id. at 1105. Thus, in such a case, the nonmoving party may defeat the motion for summary judgment without producing anything.  Id. at 1103.

Here, virtually all the evidence cited by Brooks is inadmissible and should be disregarded.  See FRCP 56(c)(1)(b), (2).  All of the declarations submitted by Brooks fail to state that the contents are "true and correct" as required under 28 U.S.C. § 1746(2). Schroeder v. McDonald, 55 F.3d 454, 460 n.10 (9th Cir. 1995); see also Nissho-Iwai Am.

Corp. v. Kline, 845 F.2d 1300, 1306 (5th Cir. 1988).  Instead, the declarations simply state, "Signed under penalties of perjury this ___day of January, 2018."  None of the declarants assert that the contents of their respective declarations are "true and correct."  Further, and as more fully set forth in the memorandum of evidentiary objections filed concurrently, all of Brooks' declarations suffer from additional defects, including failure to properly authenticate exhibits, lack of foundation, improper "expert" testimony, and inadmissible hearsay.

Despite the fact that Brooks has failed to carry its burden of demonstrating through admissible evidence that no genuine issue of material fact exists as to PTB's Counter-Claims, PTB, out of an abundance of caution, has cited to its own evidence which establishes a genuine dispute of material facts as set forth below.

**B.**     **Genuine Issues of Material Fact Exist Regarding Whether Brooks' Conduct Constitutes Unlawful Monopolization.**

   1.     Brooks' Exclusionary Conduct Considered As A Whole Constitutes A Violation Of The Sherman Act.

"The offense of monopoly under §2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 481 (1992).  In Eastman Kodak, the plaintiffs' Section 2 claims, predicated on a refusal to sell parts to ISOs together with unlawful tying arrangements and other facts establishing exclusionary conduct, survived summary judgment.  Id. at 451.  In that case, a number of ISOs who had serviced and repaired photocopy machines manufactured by Kodak sued Eastman Kodak under both sections 1 and 2 of the Sherman Act because it had "adopted policies to limit the availability of parts to ISO's and to make it more difficult for ISO's to compete with Kodak in servicing Kodak equipment."  Id. at 455.

The facts in this case are remarkably similar to the facts in Eastman Kodak.  Like

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

Kodak, Brooks "manufactures and sells complex business machines," to wit, Cryopumps, and its "equipment is unique," "software programs that operate on [Brooks] machines, for example are not compatible with competitor's machines." Id. at 456-457; SGIMF ¶¶ 2, 58, 59. Like Kodak, "[Brooks] parts are not compatible with other manufacturers' equipment, and vice versa." Id. at 457; SGIMF ¶ 58. Like Kodak, Brooks "provides service and parts for its machines to its customers. It produces some of the parts itself; the rest are made to order for [Brooks] by independent original equipment manufacturers (OEM's)." Id.; SGIMF ¶¶ 11, 12, 62.

Like Kodak, which provided "80% to 95% of the services for Kodak machines" (Id.), Brooks provides at least 70% of the services and repair for Brooks' Cryopumps and more specifically provides 89% of the service and repair of OnBoard IS Cryopumps. SGIMF ¶ 23.

Like the ISOs in Eastman Kodak, PTB is an ISO which "reconditioned and sold used [Brooks] equipment." Id.; SGIMF ¶¶ 13, 15. Like the ISOs in Eastman Kodak, PTB "provide(s) service at a price substantially lower than [Brooks] does," and "customers found that the ISO service was of higher quality." Id.; SGIMF ¶¶ 70-72. In Eastman Kodak, some of Kodak's customers "purchase their own parts and hire ISOs only for service" while "[o]thers choose [PTB] to supply both service and parts." Id. at 458. In contrast, customers in the semiconductor industry do not expect to be responsible for supplying repair parts to ISOs. Requiring the customers to supply repair parts increases the cost and the cycle time of the repair, and places PTB and third party repair services at a significant disadvantage. SGIMF ¶ 16.

As in Eastman Kodak, Brooks claims to have "implemented a policy of selling replacement parts for … machines only to buyers of [its] equipment who need [Brooks] services or repair their own machines." Id.; SGIMF ¶ 25.[2] "As part of the same policy,

_____

[2] Brooks' Global Services Manager, Rene Clement, stated that Brooks did not sell replacement parts – other than consumables – to anyone, including end users.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

1  [Brooks like] Kodak sought to limit ISO access to other sources of [Brooks] parts.

2  [Brooks] and the OEM's agreed that the OEM's would not sell parts that fit [Brooks]

3  equipment to anyone other than [Brooks]" <u>Id.</u>; SGIMF ¶¶ 26, 63.

4       Like Kodak, "Brooks took steps to restrict the availability of used machines." <u>Id.</u>;

5  SGIMF ¶¶ 79-82.  When PTB began using the parts from scrapped Cryopumps to

6  complete its repairs, Brooks accused PTB of violating its alleged copyrights, which it

7  claimed were subject to a license that prohibited transfer of the software without Brooks'

8  consent.  The software involved is firmware embedded in the Cryopumps.  Hence, the

9  supposed ban on transfer of the software effectively prevents any resale of the entire

10  Cryopump since it cannot operate without the firmware embedded in it.  Ultimately,

11  Brooks sued PTB for violating its copyright in the firmware, alleging, among other

12  things, that PTB had not succeeded to the purported license.  <u>See</u> discussion of the

13  contingent license in PTB's Motion for Summary Judgment, pp. 18-25.

14       In <u>Eastman Kodak</u>, the ISOs alleged Kodak had engaged in unlawful tying by

15  inducing photocopier buyers to agree not to use the ISOs for servicing.  <u>Id.</u> at 463.

16  Similarly, Brooks would only agree to provide service for its Robots if the customer also

17  agree to engage Brooks to service its Cryopumps.  SGIMF ¶ 51.  As in <u>Eastman Kodak</u>,

18  Brooks "intended, through these policies, to make it more difficult for ISO's to sell

19  service for [Brooks] machines." <u>Id.</u> at 458; SGIMF ¶¶ 66-67.  As in <u>Eastman Kodak</u>,

20  these policies "succeeded…Customers were forced to switch to [Brooks] service even

21  though they preferred ISO service" that PTB provided.  <u>Id.</u>; SGIMF ¶ 68.

22       Like the ISOs in <u>Eastman Kodak</u>, PTB sued Brooks for unlawfully tying the sale of

23  service for [Brooks] machines to the sale of services for Brooks' Robots, "in violation of

24  § 1 of the Sherman Act, and [alleged that Brooks] had unlawfully monopolized and

25  attempted to monopolize the sale of service for [Brooks] machines, in violation of § 2 of

26  that Act." <u>Id.</u> at 459.

27       Both the Ninth Circuit and the U.S. Supreme Court found that the claims asserted

28  by the ISOs survived Kodak's motion for summary judgment.  <u>Id.</u> at 486.  *A fortiori*,

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

1  this Court should allow the remarkably similar evidence of Brooks' unlawful tying and

2  monopolistic conduct to survive summary judgment in this case.[3]

3      2.      The Right To Refuse To Deal Is Not Unqualified.

4      In Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S.

5  398 (2004), the Supreme Court explained "The high value that we have placed on the

6  right to refuse to deal with other firms does not mean that the right is unqualified.

7  Under certain circumstances, a refusal to cooperate with rivals can constitute

8  anticompetitive conduct and violate § 2." Id. at 408.  Brooks argues that "refusal to

9  deal" is actionable only in a very limited number of cases.  That may be.  But Eastman

10 Kodak is precisely one of those refusal to deal cases that the Ninth Circuit and the

11 Supreme Court allowed to proceed to trial after surviving summary judgment.  It is not

12 alone.

13     Packaging Systems, Inc. v. PRC – DeSoto International, Inc., 268 F. Supp. 3d 1071

14 (C.D. Cal. 2017), is instructive.  There, the defendant ("PPG") manufactured and

15 distributed aerospace sealant for use in aircrafts and controlled 90% of the market for that

16 product.  The plaintiff was a sealant repackager and reseller, which purchased sealant

17 wholesale from PPG, purchased injection kits made by others, filled the kits with sealant

18 and sold them ready-to-use to the end-user.  Id. at 1078.  In August 2016, PPG sent a

19 memo to all sealant re-sellers and distributors prohibiting the packaging of its sealants by

20 anyone other than itself or its own support centers, ostensibly for a policy of maintaining

21 quality control.  Id. at 1079.

22     The plaintiff contended the quality control rationale was a pretext and that "the

23

24 ────────────────

[3] Brooks cites In re Indep. Serv. Organizations Antitrust Litig., 203 F.3d 1322, 1324 (Fed. Cir.
25 2000), for the proposition that PTB cannot force Brooks to share its intellectual property.  In
Indep. Serv., CSU alleged that Xerox violated the Sherman Act by setting the prices on its
26 patented parts much higher for ISOs than for end-users to force ISOs to raise their prices.  Id.
at 1324.  The Court of Appeals affirmed the District Court's grant of summary judgment
27 against CSU specifically distinguishing Eastman Kodak: "there are no claims in this case of
illegally tying the sale of Xerox's patented parts to unpatented products." Id. at 1327.  As
28 discussed above, the facts in this case mirror the facts in Eastman Kodak, including evidence
of illegal tying.  Indep. Serv. is thus distinguishable from the present case.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

1   real reason for this policy is to eliminate the increasingly successful competition

2   retail…" from non-PPG resellers.  Id.  Because of "PPG's virtual monopoly in the

3   production market," the plaintiff contended that PPG's new policy would "allow it to

4   monopolize the retail distribution market as well."  Id.  Like PTB here, the plaintiff sued

5   PPG for monopolization in violation of Section 2 of the Sherman Act, tying in violation

6   of Section 1 of the Sherman Act and California's Cartwright Act and four various other

7   state law claims.

8       Like Brooks, PPG argued that the monopolization claim failed because the

9   plaintiff did not and could not "allege that PPG has an antitrust duty to deal with

10   Plaintiff at all, let alone of terms favorable to its business model."  Judge Wright

11   disagreed and found that Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S.

12   585 (1985) and its holding on refusal to cooperate with a rival to be applicable to the

13   facts pleaded in Packaging Systems.

14       First, PPG terminated a prior profitable course of dealing with

15       Plaintiff.   Plaintiff…has repackaged PPG's aerospace sealant

16       resale since at least 2001.  PPG knew that Plaintiff repackaged

17       its sealant, yet besides making periodic comments to Plaintiff's

18       customers that Plaintiff was not supposed to do so, PPG took no

19       real steps to prevent Plaintiff from repackaging.   This tacit

20       acceptance of Plaintiff's repackaging is in principle no different

21       from the joint venture at issue in Aspen Skiing; in both cases,

22       the parties knowingly and voluntarily participated in a

23       (presumably profitable) course of dealing with each other for

24       years [citation omitted] and like Aspen Skiing, PPG's abrupt

25       decision to end this course of dealing suggests that it was

26       willing to sacrifice short-term profits for the possibility of

27       charging inefficient monopoly prices in the long run.

28

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

Second, PPG is apparently refusing to sell to Plaintiff at even retail value sealant that can be repackaged for resale. That is, PPG is willing to sell sealant to end-users at a particular price but will not sell the same sealant to resellers at the same price – or at any price…These facts are sufficient at the pleading stage to show that there is no real distinction between repackageable and non-repackageable sealant. And once that distinction is removed from the equation all that is left is PPG's bare refusal to sell sealant – even at retail price – to Plaintiff. Such conduct, if true, "reveal([s] a distinctly anticompetitive bent." Trinko, 540 U.S. at 409…

Finally, like Aspen Skiing, PPG sells wholesale quantities of sealant to non-repackaging resellers and other bulk-purchasers of sealant.  PPG also voluntarily sold sealant to repackagers on the same terms as it did non-repackagers for years. Thus, the Court will not have to develop from scratch the terms and conditions on which PPG must sell sealant to Plaintiff in order to remedy the refusal to deal; it simply needs to order PPG to deal with Plaintiff on the same terms as it does non-repackagers.  Trinko, 540 U.S. at 410…

Id. at 1082-83.  The facts in Packaging Systems are analogous to those in this case.  The plaintiff repackager faced a complete refusal by PPG to sell it sealant at any price, even after a history of selling it sealant for 16 years.  Just as Brooks has a monopoly on its equipment and parts and now seeks to consolidate its monopoly on repairs and refurbishing of Cryopumps, PPG was attempting to not only maintain its monopoly on sealant but also to further its monopolistic position in the packaging of sealant.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

3. **The Relevant Market Is Composed Of Only Those Companies That Service Brooks' Cryopumps Since The Service And Parts For Brooks' Cryopumps Are Not Interchangeable.**

Brooks argues that a relevant market cannot be limited to the products or services of a single manufacturer. It cites <u>Eastman Kodak</u> for the proposition that a single brand market can only exist where (1) customers have limited information regarding lifecycle costs when making their initial purchasing decision in the primary market, and (2) "locked in" customers are later exploited by a subsequent change in the manufacturer's policy. However, this language does not appear anywhere in that case. The discussion of a relevant market in <u>Eastman Kodak</u> is as follows:

> Kodak also contends that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act. We disagree. The relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners. [citation omitted]  Because service and parts for Kodak equipment are not interchangeable with other manufacturers' services and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines.

<u>Eastman Kodak</u>, 504 U.S. at 481-482.  Because service and parts for Brooks' Cryopumps are not interchangeable with other manufacturers' services and parts, the relevant market from the Brooks equipment owners' perspective is composed of only those companies that service Brooks' Cryopumps.  SGMIF ¶¶ 58-59.

4. **Brooks Has Sufficient Monopoly Power.**

Brooks admits that 65% market share is sufficient to establish a prima facie case of market power.  <u>Image Tech. Servs., Inc. v. Eastman Kodak Co.</u>, 125 F.3d 1195, 1206 (1997).  Brooks claims that its share of the ***global*** market for servicing Cryopumps is

only 48% and thus insufficient to establish monopoly power.  However, the relevant market is not the global market.  It is the North American market.  PTB does not compete with Brooks on a global scale.  SGIMF ¶ 69.  Brooks tries to move the goal posts. PTB sued for antitrust violations predicated on the U.S. market or North American market.  First Amended Counter-Claim ¶19.  Without explanation, Brooks pretends that the relevant market is global and provides its global market share in support of its Motion.  This is sleight of hand.

Brooks has market share of 89% for the service on OnBoard IS Cryopumps and 56% for the service of OnBoard Cryopumps.  Overall, Brooks has a market share of at least 70% for the service of Cryopumps in North America.  SGIMF ¶ 23.  This is more than sufficient to establish a prima facie case of market power.

5.    PTB's Refusal To Deal Claim Is Not Time-Barred.

Brooks argues that PTB's refusal to deal claim is time-barred because Brooks first implemented its core exclusionary policy outside of the limitations period.  Brooks ignores the law regarding continuing violations in the antitrust arena.  "A continuing violation is one in which the plaintiff's interests are repeatedly invaded and a cause of action arises each time the plaintiff is injured."  Pace Industries, Inc. v. Three Phoenix Co., 813 F.2d 234, 237 (9th Cir. 1987).  As explained in Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997):

> Antitrust law provides that, in the case of a 'continuing violation,' say, a price–fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' e.g., each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'

Id., at 189 (Internal cites omitted); see also Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321 (1971) ("each time a plaintiff is injured by an act of the defendants a

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

1  cause of action accrues to him to recover the damages caused by that act and that, as to

2  those damages, the statute of limitations runs from the commission of the act").

3      "[T]wo elements characterize an overt act which will restart the statute of

4  limitations: 1) It must be a new and independent act that is not merely a reaffirmation of

5  a previous act; and 2) it must inflict new and accumulating injury on the plaintiff."  Pace

6  Industries, 813 F.2d at 238; see also In re Animation Workers Antitrust Litigation, 87

7  F.Supp.3d 1195, 1211 (N.D. Cal. 2015) ("each overt act that is part of the [antitrust]

8  violation and that injures the plaintiff … starts the statutory period running again,

9  regardless of the plaintiff's knowledge of the alleged illegality at much earlier times").

10      Here, Brooks first refused to sell parts for its third generation "OnBoard IS"

11  Cryopumps to PTB in 2011.  Thereafter, Brooks continued to sell parts for all other

12  generations of its Cryopumps to PTB until it summarily refused to sell any further parts

13  to PTB in Spring 2016.  [CITE].  As in Klehr, each refusal by Brooks to sell parts to

14  PTB started the statutory period running again.  Every time Brooks refused to sell parts

15  to PTB it committed a new and independent act and inflicted new and accumulating

16  injury on PTB.  Clearly, Brooks' refusal to sell parts for any generation of its

17  Cryopumps to PTB in Spring 2016 was not merely a reaffirmation of its previous

18  refusal to sell parts for its third generation OnBoard IS Cryopumps to PTB.  However,

19  Brooks cannot escape liability for its refusals to sell parts for its third generation of

20  OnBoard IS Cryopumps merely because the practice began outside of the limitations

21  period.  Each and every refusal to sell by Brooks started the limitations running again,

22  regardless of its past practices.

23  **C.**  **Genuine Issues of Material Fact Exist Regarding Whether Brooks Entered**

24  **Into An Illegal Tying Arrangement.**

25      1.  Brooks Tied The Servicing Of Its Robots To The Servicing Of Its

26      Cryopumps.

27      As discussed, Brooks managed to secure 100% of Samsung's Cryopump repair

28  business despite the fact that Samsung's Implant division had previously stopped using

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

Brooks for Cryopump repair due to poor quality, unacceptable turnaround times, poor customer service and high costs.  PTB, on the other hand, lost 100% of Samsung's Cryopump repair business despite its perfect quality score, 20% lower prices, and better turnaround times.  Notably, the switch from PTB to Brooks occurred less than two weeks after Brooks' March 30th proposal tying its agreement to provide Robot repair services to Samsung to Samsung's agreement to engage Brooks for the repair and service of all of PVD and Implant's Cryopumps.

2.     The Evidence Supports A "Rule Of Reason" Tying Claim.

Brooks argues that PTB cannot prove an adverse effect on competition in the tied market because the contract that Brooks negotiated with Samsung permits rivals to compete for 50% of Samsung's Implant division's Cryopump repair business.  See Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc., 723 F.3d 1019, 1024 (9th Cir. 2013).  Regardless of what the contract states, PTB summarily lost all Cryopump repair work from Samsung following its negotiations with Brooks for Robot repair services.  The justification provided by Samsung for terminating PTB was pretextual.  Four days before being terminated for poor quality, PTB had received a perfect score of 4 from Samsung, meaning 0% "dead on arrivals" or early failures.  On March 31, 2017, Mike Kempel, a senior engineer at Implant endorsed the quality work PTB had provided when he suggested to Mr. Varone of PTB that PTB ought to talk to the other divisions of Samsung about providing cryopump repair services.  Moreover, Mr. Cleghorn admitted to Mr. Varone that management at Samsung had given him a mandate to obtain a service contract from Brooks for the repair of their Robots and that Brooks would only offer a Robot service contract if Samsung also engaged Brooks to repair their Cryopumps.  SGIMF ¶ 53.

Tying Robot repair to Cryopump repair clearly has an adverse effect on the end-users.  Semiconductor manufacturers are forced to engage Brooks for Cryopump repair even though ISOs such as PTB provide higher quality work at a lower cost.  SGIMF ¶ 100.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN

1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

Brooks further argues that PTB cannot prove that Brooks has market power in the tying market for Robot repair.  See Illinois Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 46 (2006).  As discussed above, the relevant market is composed of only those companies that service Brooks' Robots since service and parts for Brooks' Robots are not interchangeable with other manufacturers' services and parts.  Brooks holds a share of 95-99% of this market.  SGIMF ¶¶ 61, 89-90.  This is more than sufficient evidence of market power.

    3.    The Evidence Supports a Per Se Violation.

"A tying arrangement will constitute a per se violation of the Sherman Act if the plaintiff proves '(1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." Sidibe v. Sutter Health, 4 F. Supp. 3d 1160, 1178 (N.D. Cal. 2013).

As discussed, Brooks holds a 95-99% share of the market for Robot repair, which is more than sufficient evidence of market power.  The 'not insubstantial' requirement can be satisfied by the foreclosure of a single purchaser, so long as the purchaser represents a 'not insubstantial' dollar-volume of sales." Datagate, Inc. v. Hewlett-Packard Co., 60 F.3d 1421, 1425 (9th Cir. 1995).  In Datagate, the court held that a single service contract worth approximately $100,000 per year was sufficient to satisfy this requirement.  Id. at 1426.  PTB has lost approximately $500,000 per year in revenue as a result of the tying arrangement imposed by Brooks against Samsung.  SGIMF ¶ 98.  As in Datagate, this amount is substantial enough to establish a per se violation.

**D.**    **Genuine Issues of Material Fact Exist Regarding Whether Brooks' Conduct Injures Competition.**

PTB prices its Cryopump rebuilding competitively and routinely prices its services at about 25% below Brooks' rates.  PTB has perfected systems that allow it to efficiently process refurbishing orders and to achieve turn-around times much shorter

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

than Brooks.  PTB achieves commendable quality assurance levels and enjoys a

warranty return rate similar to or lower than Brooks.  SGIMF ¶¶ 70-72.  Forcing

semiconductor manufacturers to engage Brooks for the service and repair of their

Cryopumps when ISOs such as PTB provide higher quality work at a lower price with

shorter turn-around time clearly harms the end-users and competition in the manner that

the antitrust laws were intended to prevent.

**E.    Genuine Issues of Material Fact Exist Regarding PTB's State Law Claims.**

    1.    The Evidence Supports PTB's Claim Under The Cartwright Act.

As detailed in Section C above, the evidence supports a tying claim under the

Sherman Act.  Given that federal and state tying claims have the same requirements, the

evidence similarly supports a tying claim under the Cartwright Act.

    2.    The Evidence Supports PTB's Claim Of Unfair Competition.

PTB's unfair competition claim is premised on Brooks' violation of federal and

state anti-trust laws.  Given that the evidence supports PTB's federal anti-trust claims,

the evidence similarly supports PTB's claim of unlawful, unfair or fraudulent business

practices under California Business and Professions Code § 17200.

    3.    The Evidence Supports PTB's Claim Of Trade Libel.

Brooks presented a PowerPoint presentation entitled "Brooks Automation Robot

and Cryopump Support and Service" to Samsung when it was attempting to secure its

Cryopump repair business.  The presentation allegedly summarizes a failure analysis

performed by Brooks on a Cryopump repaired by PTB.  The analysis attributes damage

to PTB that could just as easily have occurred through mishandling of the Cryopump

either through shipping or internal handling, that is the result of normal wear and tear, or

that was caused by the Cryopump being disassembled improperly.  The analysis further

identifies allegedly suspect hardware without any data in support and electronic issues

with no tie to PTB besides Brooks' bare assertion.  Samsung itself described the

presentation as slanderous.  SGIMF ¶ 56.  Within less than two weeks after the

presentation of the disparaging slide show, Samsung's Implant division abruptly

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

terminated PTB for a patently bogus reason.  This evidence amply supports a claim for trade libel against Brooks.

    4.   <u>The Evidence Supports PTB's Claim Of Intentional Interference.</u>

As set forth in Sections C and E(3) above, Brooks has engaged in unlawful tying and trade libel.  This wrongful conduct is sufficient to support PTB's claim for intentional interference.

**IV.**   <u>**CONCLUSION**</u>

Based on the foregoing, PTB respectfully requests that the Court deny Brooks' Motion for Summary Judgment in its entirety.

Respectfully submitted,

Dated:  February 12, 2018     LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN


By: */s/ Andrew W. Zepeda*
    ANDREW W. ZEPEDA
    STEVEN L. HOGAN
    PAYTON E. GAROFALO
    ALEXIS I. FRAGOSA
    Attorneys for Defendant and Counter-Claimant PTB Sales, Inc.

**LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN**
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document: **DEFENDANT AND COUNTER-CLAIMANT PTB SALES, INC.'S OPPOSITION TO PLAINTIFF AND COUNTER-DEFENDANT BROOKS AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT,** with the Clerk of the Court using the CM/ECF system which will send notification of such filling to the Electronic Service List for this Case, to wit:

| | |
|---|---|
| Ronald J. Nessim, Esq.<br>Ashley D. Bowman, Esq.<br>BIRD, MARELLA, BOXER,<br>WOLPERT, NESSIM, DROOKS,<br>LINCENBERG & RHOW, P.C.<br>1875 Century Park East, 23rd Floor<br>Los Angeles, CA 90067 | *Attorneys for Plaintiff*<br>*Brooks Automation, Inc.* |
| Michael H. Bunis (pro hac vice)<br>Justin Wolosz (pro hac vice)<br>Kevin C. Quigley (pro hac vice)<br>CHOATE, HALL & STEWART LLP<br>Two International Place<br>Boston, MA 02110 | *Attorneys for Plaintiff*<br>*Brooks Automation, Inc.* |

Executed on **February 12, 2018**, at Los Angeles, California.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN

By: */s/ ANDREW W. ZEPEDA*
     **ANDREW W. ZEPEDA, ESQ.**
     *Attorney for Defendant and*
     *Counter-Claimant PTB Sales, Inc.*

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

{00409394.DOCX}